IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.R. NO. 05-123T
UNITED STATES OF AMERICA *
VS. * MARCH 20, 2008
11:00 A.M.
MANUEL CORADIN *
* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE ERNEST C. TORRES,

SENIOR JUDGE

(Sentencing)

APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT: KEVIN J. FITZGERALD, ESQ.
Federal Defender's Office
10 Weybosset Street
Providence, RI 02903

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

Interpreter: Ana-Cecilia Rosado

20 MARCH 2008 -- 11:00 A.M.

THE COURT: Good morning.

THE CLERK: The case now before the Court is criminal matter 05-123T, United States of America versus Manuel Coradin.

THE COURT: This case is here for sentencing, Mr. Coradin having previously pled guilty to one count of possessing more than 50 grams of cocaine base with intent to distribute and one count of possessing five grams or more of cocaine with intent to distribute.

Mr. Fitzgerald, Mr. Coradin, have you both had an opportunity to review and discuss the pre-sentence report?

MR. FITZGERALD: Yes, your Honor. Answer the question.

THE DEFENDANT: Yes, your Honor.

THE COURT: You may be seated. I understand that the Defendant has some objections to the pre-sentence report. I'm a little bit uncertain as to exactly what the objections are or whether they're all still being pressed, Mr. Fitzgerald.

I know in your memorandum, your objection to the pre-sentence report, you appear to identify two objections; but the pre-sentence report suggests that that might not be a complete list here.

The two that are set forth in your objection to the report are, first, that the probation officer should not have converted the monies seized directly into a quantity of cocaine base but, rather, should first have converted it into marijuana and then into cocaine base and that that does make a difference in the offense level and, second, that the conversion rate of $75 per gram was incorrect and that the rate should have been $100 a gram.

Is that a fair summary of the objections or did I miss something or misstate something?

MR. FITZGERALD: Your Honor, that was the objection that I filed originally. Obviously, it's been some time since that original objection was filed. I filed a supplemental -- supplement to the objection I think that more squarely lays out the objections. I can address those today, and I think I can make it succinct for the Court.

THE COURT: All right.

MR. FITZGERALD: Your Honor, the objections are, I guess, multi-layered and a little complicated because of the change in the crack cocaine guidelines; but the first step in the objection, your Honor, is whether or not to convert the seized monies into a drug equivalency for the purposes of determining the

guideline range.

I should say it's become somewhat common practice that any time cash is seized in a case, that the cash is automatically converted into a drug amount and added into the guideline calculation.

The guidelines and also *United States v. Gerante*, the case that supports this, really say that the Court must first determine whether or not the drugs seized on their own determine the appropriate guideline and, if not, then add in any cash seized to come up with the appropriate guideline.

So I think the Court needs to make a determination first of whether or not the guideline is appropriate without the money seized and, if it's not, if the drugs that were seized here do not show the complete range of the crime or the complete culpability, then the Court can go and add the seized money into the calculation.

THE COURT: I don't follow you, Mr. Fitzgerald.

MR. FITZGERALD: Your Honor, in the guidelines, Section 2D1.1, in the comments where it talks about converting cash into a drug amount, the only time the Court can do that is if the drugs seized don't adequately display the full range of the crime.

So if the drugs that are seized come out with a

guideline range and the Court feels that that is the appropriate scope of the crime, then there's no need to go further into the cash.

THE COURT: That's just another way of saying that the monies seized was not the proceeds of the drug offense.

MR. FITZGERALD: No, not necessarily. The Court has to make that decision. That's what I'm saying. So if -- that's not the way that the guideline's worded; but if the drugs were seized, the amount of drugs were seized and the Court felt that was enough for the guideline, there's no need to add the cash on as well.

THE COURT: But isn't the question here whether the cash is proceeds of drug transactions? Because if it is, if there's a substantial amount of cash that is the proceeds of drug transactions, then the drugs alone don't represent the full magnitude of the crime.

MR. FITZGERALD: I think that's the question that the Court has to answer. If the Court feels that way, and for the rest of my argument here I would assume that that is the decision that the Court would make, then we add the cash in.

THE COURT: Well, how else would I interpret that under these circumstances?

MR. FITZGERALD: The calculation of the

guidelines is based on the drug weight first, and only after you determine that calculation can the Court determine whether or not that represents the full scope of the crime.

THE COURT: Well, to take an extreme example, let's say that all of the facts point to Mr. Coradin having been a dealer in crack cocaine and that a million dollars was seized in his apartment and he had no other apparent source for the money.

Are you saying that the Court should not take into account the million dollars in determining the magnitude of his drug dealing?

MR. FITZGERALD: No. If the Court felt that million dollars was drug proceeds and did more adequately represent the full scope of the crime, then yes, then you bring it in.

But if the Court doesn't feel that the cash represents the scope of the crime -- I'm sorry, that the drugs that are seized themselves or the behavior that creates the guideline range initially, if the Court feels that that guideline range is enough to represent the whole scope of the crime without the cash, then you don't add the cash in.

Assuming that the cash is added in, and in this case I've done a lot of different calculations for the

Court, but assuming that it is in this case, because Mr. Coradin was charged with possession with intent to distribute crack cocaine, cocaine base and also possession with intent to distribute cocaine powder, this cash should be proportionally distributed between the two types of drugs for purposes of converting it into a drug weight. That is really, I think, the only fair way to do that, to convert that.

And in this case, it's -- approximately 81 percent of the drugs seized were cocaine base, and 19 percent were cocaine powder.

If the cash is split between the two and then converted into powder or cocaine base based on probation's evaluation, the evaluation amounts given to them by the DEA, the result is approximately a total of 483 grams of cocaine base and 115 grams of cocaine powder.

Now, there's no other -- there's no controlled buys in this case. There's no other indication that Mr. Coradin was dealing solely in cocaine base or cocaine powder. So there's really no other basis to distribute or proportion the cash equivalence to the drugs that are present other than splitting it proportionally between the two amounts.

THE COURT: And would that make a difference in

the guideline range here?

MR. FITZGERALD: I think it does, and here's why, your Honor. When the crack cocaine guidelines were changed by the last amendment -- I'm sorry, let me go back to the beginning.

Before the crack cocaine guidelines were changed, the ratios between the various drugs were always the same no matter what guideline range and what amount the drugs were. So one gram of cocaine powder was always equal to -- I'm sorry, one gram of cocaine base was always equal to 100 grams of cocaine powder, one gram of cocaine base was always equal to 20 kilograms of marijuana, one gram of cocaine powder was always equal to 200 grams of marijuana, and all those ratios interrelate with each other exactly.

Now, when the Sentencing Commission lowered the crack cocaine guidelines by two offense levels, it upset that ratio. And when it got down to creating a conversion rate for crack cocaine into a marijuana equivalent in polydrug cases like this, it creates an anomalous result in a number of different guideline levels.

Mr. Coradin falls into one of those guideline levels. Your Honor, in Level 30, which covers 150 grams to 500 grams of cocaine base, when there are

more than one drugs present, more than one drug present, the conversion rate for cocaine base goes up to Level 32 before you even get to 500 grams of crack cocaine, before you even consider the other drug.

So if a person has 448 grams of cocaine base and one gram of marijuana, he automatically jumps up to the next level; but we all know that one gram of marijuana is never equal to 50 grams of crack.

Now, in this case, when you split the cash proportionally, the cocaine base is roughly 483 grams. The cocaine powder is 115 grams. If you do it by the conversion rate that is in the guidelines right now, yes, it comes out as a 32. It goes up to the next level.

But, your Honor, we know that 115 grams of powder is never equal to 17 grams of crack because it's always been 100 to 1. Since they've changed it, the lowest rate it's been is 20 to 1; but it's never -- 115 grams of powder is never equal to 17 grams of crack.

Now, this anomalous result, your Honor, is just one of the problems with the change in the guidelines. So it does make a difference, and that's the ultimate end point of the objection.

THE COURT: Well, it doesn't make a difference

under the guidelines, though, does it? What you're saying is that the Court shouldn't follow the guidelines because they don't comply with the spirit of the amendment, what you think is the spirit of the amendment to the guideline.

MR. FITZGERALD: Well, I certainly agree with that, but what I'm saying is that the calculations, this wasn't supposed to happen, and this shouldn't have happened. And if one person comes in here with 499 grams of crack only and gets a Level 30 and Mr. Coradin gets a Level 32 because he has some powder along with his 483 grams of crack, that's an anomalous result, and that's why it's not correct.

THE COURT: But it's a result that is consistent with the way the guidelines read, isn't it?

MR. FITZGERALD: Your Honor, yes, that's the way it's written in there, and it's just incorrect.

THE COURT: What you're arguing for is a variance or a departure.

MR. FITZGERALD: No. I'm asking the Court to recognize an error in the guidelines. I'm not asking for a variance. I'm not asking for a departure.

Your Honor, my understanding is this anomaly is going to be fixed shortly. And in that situation, when it is fixed, Mr. Coradin would be a Level 30. So I had

asked that the cash be split proportionally as part of my objection.

I'm still asking for that. Even if the Court doesn't agree that it lowers his offense level to a 30, I'm still asking that the cash be split proportionally between the two drugs.

THE COURT: Are you asking about the base offense level or the net offense level when you say it's a 30?

MR. FITZGERALD: The base offense level for the crack cocaine is a 30. The net offense level on the conversion rate as it is today is a 32. But what I'm saying is the cash needs to be split proportionally between the two drugs; and when this is fixed, that would make his net offense level a 30, not a 32.

THE COURT: How do you get around *Gerante* when you say the cash should be split between the two drugs?

MR. FITZGERALD: *Gerante* doesn't directly address how the Court allocates the money, to which drugs. And what I was getting at originally in my original objection is, I've seen this Court, whether it was you, your Honor, or one of the other judges, it's been converted into marijuana in certain situations, it's been converted into the drug that's present, it's been converted based on the transaction. There's been

a number of ways it's been converted. It hasn't been particularly consistent.

When you've got more than one drug and the person is charged with selling more than one drug, the only fair way to do it is to divvy it up proportionally between the drugs present. And I should say the -- in the case that it was all converted to marijuana, that person wasn't charged with actually selling marijuana; but that's a different situation.

Your Honor, I'd ask that the Court grant my objection. I have -- one moment, please, your Honor.

(Pause)

MR. FITZGERALD: Thank you.

THE COURT: Mr. Dambruch.

MR. DAMBRUCH: Yes, your Honor. Your Honor, to begin, I'd like to clarify a few matters as to what is or isn't in dispute.

It's my understanding, your Honor, that the Defendant is not disputing the fact that the over $25,000 seized from his residence were, in fact, the proceeds of drug sales. If that is a point in dispute, I could introduce before the Court the Defendant's statement to police in which he acknowledged that very fact.

Furthermore, I've been advised by defense

counsel that he doesn't dispute the conversion rate used by probation. There was some mention of a potential dispute in some early filings, but this morning I was advised that he now does not dispute the use of the $75 per gram figure. And as a result, I released a witness that I would have intended to call to support that figure.

What appears to be in dispute is, first off, whether or not the amount of drugs seized in this matter pursuant to the guideline provision adequately addresses the conduct.

I would argue to the Court that that is not the case here because the amount of money seized was a significant sum of money. It wasn't one or two thousand dollars. It was $25,000. And when the conversion is done, that equates to a significant additional quantity of crack cocaine.

So I'd argue that in this particular set of circumstances, just relying upon the quantity seized does not begin to address the scope and seriousness of this Defendant's activity.

I'd further argue that that is supported by the Defendant's economic situation. If you look at the pre-sentence report, this Defendant was, although employed in some capacity, making very little money.

His source of income, major source of income, significant source of income, how he made his living was by selling crack cocaine.

Now, that's also supported by his criminal history. The Court would note that in 2003 the Defendant was convicted of being involved in the distribution of crack cocaine in the state system. He was possessing 18 bags of crack cocaine with the intent to distribute.

So I'd argue that in this case it's appropriate in order to fully address the Defendant's conduct to do the conversion.

Now, with regard to Mr. Fitzgerald's argument that there should be some kind of proportionate conversion, I would disagree with that. This Defendant sells crack cocaine. That's how he makes his money. And I base that proposition on, A, his criminal history but, B, the facts and circumstances of this particular case.

When the police executed the search warrant at the Defendant's residence, they did find some powder cocaine; but what they further found was a much larger quantity of crack and the instrumentalities that are used by people like the Defendant to convert powder to crack, and then it's the crack that's sold.

I would point the Court's attention in the prosecution version to the pans that were found, one of which contained some cocaine/crack residue, which is consistent with the process used by drug dealers like the Defendant to take the raw material, which is the powder, to convert it into the more valuable commodity of crack cocaine and then to sell the crack.

In effect, the powder is simply one of the materials or pieces of the product that is ultimately sold. The money that the Defendant realizes, the profit that he realizes, the cash that we're asking you to convert resulted from crack cocaine sales. I would argue that's the only logical conclusion based upon the evidence recovered in this particular case. Therefore, no proportionate conversion would be appropriate.

Lastly, with regard to Mr. Fitzgerald's arguments on the conversion rate, first off, as the Court has already noted, the conversion rate used by probation, that being in a polydrug situation, is, in fact, the conversion rate set forth in the guidelines. So probation did it correctly.

Now, the Court asked Mr. Fitzgerald if he was advocating for either a variance or a departure. I would point out that I would hope that's not the case because Mr. Fitzgerald, or the Defendant, as part of

our plea agreement agreed that he would not ask the Court to vary below the guideline range.

And that was something that was bargained for because in this particular case the Government could have filed an 851 enhancement notice which would have resulted in a 20-year minimum mandatory sentence. The Government forewent that possibility, and Mr. Fitzgerald agreed not to argue for a variance.

I suppose he didn't agree not to argue for some sort of departure. The two cases I've been able to find, district cases that Mr. Fitzgerald has cited on this particular point, one is *U.S. v. Horta* out of Maine. In that case, the district judge relied on a 3553(a)-based variance.

There was, however, a second case, *Watkins*, where the judge did cite to 5K2.0 to justify a downward departure.

But the Government's position is, the Sentencing Commission adopted these new crack cocaine guideline provisions; that when they did so, they created a new conversion rate; that that conversion rate is what was intended; and that if you look at the language of 5K2.0 cited by the Court in *Watkins*, it's 5K2.0(a)(2)(B), it talks about unidentified circumstances and states as follows: "A departure may be warranted in the

exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that, nevertheless, is relevant to determining the appropriate sentence."

I would argue to the Court the Commission identified this circumstance, determined what they felt would be the appropriate rate of conversion in a polydrug case, that is varied by the amount of crack cocaine involved, and that was the intended consequence.

Mr. Fitzgerald may disagree with the Commission's decision in that regard, but it wasn't an unidentified issue.

So for all those reasons, your Honor, I would object to the Defendant's objections and ask the Court to adopt the guideline range calculated by the Probation Department and set forth in the pre-sentence report.

THE COURT: Well, I can't really add much to what Mr. Dambruch has said here. I think he has very nicely covered the relevant points here.

There are two arguments that are being made. The first is that the drugs -- in effect the first argument is that the cash should not be considered in calculating the drug quantity that drives the

determination of the guideline range because the drugs alone represent the full scope of the crime or, I think more accurately using the guideline language, the drugs adequately represent the magnitude of the crime. That simply is not the case here for the reasons that Mr. Dambruch has so clearly stated.

The amount of cash we're talking about here is $25,000. It might be a different matter if we were talking about a small sum of cash. Twenty five thousand dollars is a substantial amount of cash. There's no question that the money was the proceeds of dealing -- of selling crack cocaine. So the Court would be ignoring reality if it didn't take into account the equivalent in crack of the cash. The probation officer was correct in factoring that into her calculation.

The second argument that the cash should be proportionally distributed between the cocaine base and powder has some surface appeal; but when one looks at the facts as outlined here by Mr. Dambruch, that appeal quickly evaporates.

There's no question that, at least in my mind, it's been proven certainly beyond a reasonable doubt or a fair preponderance that the Defendant was making his money selling crack cocaine. He wasn't selling cocaine

powder. He was selling crack, and the powder was simply the raw material from which the crack was produced. It's cooked until it turns into the form known as crack.

And the evidence of that, again, is overwhelming. The instrumentalities found in the Defendant's apartment clearly showed that. There were pans found with residue of crack on them. It's also well known that crack sells at a much higher price than cocaine powder.

So it's abundantly clear here that the Defendant was earning his money by selling crack cocaine; and, therefore, it was perfectly appropriate to convert the cash into the crack.

As far as what Mr. Fitzgerald has argued is the anomaly in the new conversion rate of the guidelines, Mr. Dambruch has adequately rebutted that argument, I think, in pointing out that those new conversion rates were adopted at the time the guidelines were amended and were clearly contemplated and intended by the drafters of the guidelines.

And there's no question that, in any event, that that's what the guidelines say, and the probation officer was following the guidelines in making -- using those conversion tables.

Now, Mr. Dambruch -- Mr. Fitzgerald has made it clear that he's not arguing for a variance or a departure, for good reasons as explained by Mr. Dambruch that the plea agreement precludes an argument for a variance or a departure, and the Government in bargaining for that took off the table the possibility of a very lengthy mandatory minimum sentence here.

So the question isn't whether based on this so-called anomaly which was just adopted that that should be grounds for a variance or a departure. I don't think it would be anyway, but I guess I don't even have to reach that question because there is no argument being made for a variance or a departure.

So based on all those things, I find that the probation officer has correctly calculated the net offense level here as Level 31, giving Mr. Coradin credit for acceptance of responsibility, the three-level reduction for accepting responsibility at an early stage, and criminal history category is Category V. Therefore, the guideline range is 168 to 210 months.

Mr. Coradin, is there anything you would like to say before the Court imposes sentence?

THE DEFENDANT: Yes, your Honor. I would like

to say that I'm sorry for my action, for what I did. I know I did something wrong, you know, and I'm sorry for the people that I hurt, especially the victims and my family, you know what I mean, they got to go through all this pain and suffering for my actions, you know.

I'm very, very sorry, you know what I mean. I'm going to try to take this time to better myself for when I get back into society, I'll be a perfect man, you know what I mean, work for my living like a right -- like a man's supposed to do, you know. That's the only thing I got to say.

THE COURT: You may be seated, Mr. Coradin.

Mr. Fitzgerald.

MR. FITZGERALD: Your Honor, I'm sorry. Based on the Court's decision on my objection, the bottom end of the guideline range is 168 months. I submitted a brief sentencing memorandum asking for the bottom of the guideline range of 168 months; and given everything involved in this case, that appears to be the appropriate sentence.

So we'd ask the Court to impose the bottom end of the guideline range, the 168 months here.

THE COURT: Mr. Dambruch.

MR. DAMBRUCH: Your Honor, based on the terms and conditions of the plea agreement and, more

importantly, on the facts and circumstances of this case and the Defendant's criminal history, the Government is recommending a sentence at the low end of the guideline range, that being 168 months.

We're further recommending a four-year period of supervised release upon his release from his period of incarceration and, lastly, a $200 special assessment.

THE COURT: Would you stand up, please, Mr. Coradin, while I pronounce sentence.

Based in part on the guideline range that applies here, which provides for a very substantial sentence, and the Government's recommendation, I'm going to take those two things into account in determining your sentence. As I've already said, the guideline range is 168 to 210 months.

Now, in imposing sentence, the Court doesn't stop with what the guidelines say. The Court has to look at certain factors that are set out in the statute that deals with sentencing to determine what a fair and just sentence would be in this case based on the crimes that you've committed and your own history.

In this case, as I find in most cases, the guidelines have adequately and appropriately taken into account what those factors are. I'll go over them very briefly so you'll understand what the basis for your

sentence is.

The statute says the Court should look at the nature and circumstances of the offense, and that's exactly what the guidelines have done here. Your offense level under the guidelines is based on the nature of the crime, selling crack cocaine, and the circumstances.

The guidelines look at factors that may be aggravating or mitigating. In your case, there weren't any. There was no adjustment for the use of a firearm or anything like that. So the guidelines have taken those factors into account.

The statute also says that the Court should look at the history and characteristics of the Defendant; and, again, the guidelines have done this. You have a criminal history category of V, which is a pretty high criminal history category, and that's because you have an extensive criminal record. That has come back in a way to haunt you here. The guidelines factor that in in determining your criminal history category.

The statute also says that the Court needs to look at the need for the sentence to reflect the seriousness of the offense, promote respect for the law and provide just punishment. And for reasons that I've already stated, I think the guidelines do that.

Selling crack cocaine, especially in the quantities in which you dealt it, is an extremely serious offense and calls for a severe penalty. Crack cocaine ruins a lot of people's lives, and the guidelines and the law take that very seriously.

The statute also says that the sentence should afford deterrence to criminal conduct and protect the public from further crimes of the Defendant, and by that it means that the penalty needs to be severe enough to deter you from doing this again or others from committing similar crimes, and also to protect the public, and the public is obviously protected when an individual who commits such crimes is incarcerated.

And finally, the statute says that the Court should look at whether the Defendant needs educational or vocational training or treatment and how it can most effectively be provided.

It appears that you may need some treatment or help in dealing with substance abuse problems. You've had some substance abuse problems in the past, and I suspect that that may be one of the things that led you to get involved in being a dealer.

And you've got to deal with that problem. You've got to overcome that problem, Mr. Coradin, because unless and until you do, you're not going to

have any chance of making a success of your life.

You're a young man. You still have a chance to turn things around, even though you're facing a lengthy prison sentence; but you're not going to be able to do that unless you can overcome this drug problem.

One good thing I can tell you is that the Bureau of Prisons has some excellent drug treatment programs, and you can get some help, some very effective help when you're in prison in dealing with that problem if you want the help. Nobody can force you to take advantage of it, but you'll have the opportunity to participate in some of these drug treatment programs.

And you'll have other opportunities as well, educational opportunities, opportunities to learn job skills; but your first priority needs to be dealing with your drug problem.

So in my judgment, the guidelines have adequately taken all of these factors into account, and the only question remaining is where within the guideline range should you be sentenced. And as I indicated earlier, there are two things that tell me your sentence should be at the lowest end of the guidelines.

And those two things are, the guidelines provide for, even at the low end, for a very substantial

sentence. The second thing is the Government has recommended a sentence at the low end.

I don't always accept the Government's recommendations, but in this case I certainly do. I put stock in the Government's recommendation. As a result of your plea agreement, they have recommended a sentence at the low end.

So the bottom line, Mr. Coradin, is that I hereby commit you to the custody of the Bureau of Prisons or the Attorney General, I should say, for a period of 168 months on each of the two counts of conviction, those terms to be served concurrently.

In other words, your total sentence is 168 months. You're not serving consecutive sentences on each count.

Following the completion -- and I'll ask the clerk to note on the judgment form that Mr. Coradin be assigned to an institution that has a program of substance abuse counselling and treatment to help him overcome his substance abuse problem.

Following the completion of your sentence, I place you on supervised release for a period of five years on Count I and three years on Count II, again, those terms to run concurrently with each other.

And as a condition of your supervised release,

I'll require that you continue to participate in a program of substance abuse counselling and treatment, either inpatient or outpatient, to be determined by the probation officer, which may include testing up to 72 times per year to verify that you are not using illegal substances.

That's for your own good, Mr. Coradin. I'm hoping that by the time you get out of prison, you won't have any need for further substance abuse treatment or, if you do, it will be minimal; but for your own good, I'm going to make that a condition of your supervised release.

I'm not going to impose any fine because it doesn't appear that you have any assets with which to pay a fine, but I am required to impose a special assessment of $100 on each of the two counts of conviction for a total of $200.

You may be seated, Mr. Coradin. I need to inform you that you have a right to appeal your sentence. Your attorney made several arguments that the Court did not accept, so you can appeal the sentence. I don't know whether your plea agreement has a waiver of appeal in it or not.

MR. DAMBRUCH: It does, your Honor. If the Court sentenced the Defendant within or below the

guideline range, the Defendant has waived his right to appeal.

THE COURT: I guess there still is -- there may be a question, it's very hard to say whether there's a question as to whether there was a dispute as to what his guideline range was, and I'll construe it liberally in favor of Mr. Coradin. That can be sorted out later. If you can convince the Court of Appeals that that right has been waived, you can certainly make that argument, Mr. Dambruch.

But for now I'm going to tell Mr. Coradin that he has a right to appeal his sentence. That may or may not be the case, Mr. Coradin, because of the terms of your plea agreement; but you can talk to Mr. Fitzgerald about this when the hearing is over, and he can advise you on that.

If you decide that you wish to appeal your sentence, you should be aware that you have to file a notice of appeal within 10 days. And if you don't file a notice within that time, you might lose any right to appeal that you otherwise would have. Mr. Fitzgerald can help you in filing that notice of appeal if that's what you decide you want to do.

Do you have anything further, Mr. Dambruch?

MR. DAMBRUCH: No, your Honor.

THE COURT: Mr. Fitzgerald?

MR. FITZGERALD: Just very briefly, your Honor. I just want to reiterate our objection on the proportionality split of the monies, and that's based on the information that was provided to the Court from the prosecution in its prosecution version in the PSR.

Also in the PSR is the valuation of both crack cocaine and powder cocaine at $75 per gram. So the value is equal between the two substances. And I just wanted to mention those on the record and continue my objection.

THE COURT: I think you already did; but if you didn't, it would be a little late to be making those arguments. I gather what you're trying to say is that you, in effect, were arguing for a different guideline range.

MR. FITZGERALD: Yes, I was, your Honor; but the reason I'm bringing it up now is because it's been pointed out in the appellate court that if I don't bring it up now, even though I brought it up earlier and disagree with the Court, my objection doesn't carry on.

That's been argued by the Government, and I want to make sure that I reiterated the objection now. I may be just overdoing it, but that's why I'm

reiterating it now.

THE COURT: What case is that?

MR. FITZGERALD: That's just what's been argued by the Government. Okay.

THE COURT: All right. Court will be in recess.

(Adjourned)

* * * * * * * *

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Karen M. Wischnowsky________________

Karen M. Wischnowsky, RPR-RMR-CRR

June 4, 2008

Date